IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Natasha Anderson, ) | C/A No.: 4:10-2792-RBH-SVH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | REPORT AND RECOMMENDATION |
| Roche Carolina Inc., ) | |
| ) | |
| Defendant. ) | |
| ) | |

Natasha Anderson ("Plaintiff" or "Anderson") filed this employment discrimination case against her former employer, Roche Carolina Inc. ("Defendant" or "Roche"), alleging claims of (1) discrimination and retaliation pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), and (2) unlawful denial of medical leave and retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2601, et. seq ("FMLA"). This matter comes before the court on Defendant's motion for summary judgment filed July 15, 2011 [Entry #32]. After considering the filed memoranda and the arguments of counsel at a hearing held on September 20, 2011, the undersigned recommends that Defendant's motion for summary judgment be granted.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration.

I.      Factual Background

Plaintiff began working for Defendant in September 2006 as a Process Technician assisting in the manufacture of pharmaceuticals on a team that worked rotating shifts. On July 24, 2009, Defendant terminated Plaintiff for having slept on the job on third shift, a willful neglect of duty under its policy.[1]  Plaintiff claims that her termination was in violation of the ADA and FMLA because she was in the midst of seeking accommodation for treatment of migraines.

Plaintiff's migraines began prior to her employment at Roche, but she never missed any time from work as a result of her migraines prior to 2009.  In January 2009, at Defendant's suggestion, she completed the FMLA paperwork and was approved for intermittent FMLA leave based on her migraines.

On June 24, 2009, Plaintiff had a migraine, requested and was approved advanced FMLA leave.  In accordance with company procedure, Plaintiff called Defendant's toll-free telephone number (Plaintiff Dep. 54) and called her team leader, James Lewis, each day from June 24 to 29, 2009 to let him know that she would remain out the following day.  In addition to Anderson's calls to Lewis, Lewis on two occasions attempted to contact her. First, he left several messages before finally reaching Anderson to ask her how she wished him to classify

---

[1] *See* Roche Policy No. 16 Discipline (issued 05/96, revised 03/01): Disciplinary Offense III. B. classifies offenses "of a more serious nature and which will generally warrant initial discipline such as suspension and/or immediate disciplinary termination" ... including "willful neglect of duty (including, but not limited to, sleeping on the job)." Bates RCI 00104 (available at Entry #32-8, pp.16–17).

2

her leave. (Pl. Dep. 57–58.) Second, he called on the evening of June 30th when he had not heard from her regarding whether she intended to return to work that week, as she had previously agreed to call him that afternoon and let him know. (*Id.*).

Plaintiff testified that she felt Lewis was harassing her about returning to work and that he said that he did not want to hear about her medical condition or FMLA leave, which he considered excess information, but that his concern as a supervisor was covering his shift. (Plaintiff Dep. 60–69, 211–212). She complains that Lewis called near midnight, waking her and her family. (Plaintiff Dep. 60–69). Plaintiff testified that while Lewis did not order her to return to work, that she "could tell by his tone and the way the conversation ended that he was agitated that [Plaintiff] would not be at work—back at work until the 6th." (Plaintiff Dep. 69).

Plaintiff complained to Blocker that Lewis's calls to her at home were bothering her. (Pl. Dep. 69–71). Blocker told her that Lewis was just trying to cover his shift, but that she should take the time she had requested to rest. (Pl. Dep. 73–74). He indicated he would speak with Lewis about the matter. (*Id.*). Lewis thereafter did not call Plaintiff at all during the last five days of her leave. (Pl. Dep. 75). Plaintiff returned to work on Monday, July 6, 2009. (Pl. Dep. 78).

On July 7, 2009, Plaintiff met with Blocker and HR Generalist Carla Montgomery regarding her complaints about Lewis's calls. (Pl. Dep. 82.) Blocker and Montgomery reiterated that they did not believe Lewis meant to upset Plaintiff, but that he was merely trying to cover his shift. (*Id.*). Plaintiff agreed that Lewis meant her no harm, but was merely

3

trying to cover his shift. (*Id.*).

Plaintiff worked the first shift during the week of July 6, 2009 (Pl. Dep. 78), taking no medications for her headaches and working without incident. (Pl. Dep. 75–76, 78). On July 10, 2009, Plaintiff met with the company's onsite doctor, Dr. Carolyn Reynolds, who advised her to return to her physician, Dr. Jebaily, for appropriate medical advice for her migraines. Plaintiff saw Dr. Jebaily that afternoon and obtained two prescriptions: 1) Imitrex for her headaches, and 2) Phenergan refill for anti-nausea. (Pl. Dep. 84, Ex. 9). She testified that she did not take either of the medications over the weekend. (Pl. Dep. 85).

The week of July 13, 2009 was a third-shift week for Plaintiff's team, which reported at approximately 11:00 p.m. on Sunday, July 12. (*Id.*). Team Coordinator Mike Brown supervised the third shift in the absence of Team Leader James Lewis, who was on vacation. According to Defendant, Montgomery received reports that Brown and other team members had observed Plaintiff sleeping repeatedly in the control room and/or break room on each of the first four days of the week, missing several hours per shift. (Montgomery Dep. Ex. 6; Brown Dep. Ex. 1). Brown testified that he received complaints from Plaintiff's co-workers that her sleeping unfairly forced the others to work harder to make up for her lack of work. (Brown Dep. 51). At the beginning of the last shift of the week, Brown met with Plaintiff and confronted her about sleeping on the job. (Pl. Dep. 93–94). Plaintiff did not sleep thereafter, but threatened to contact Blocker about the matter. (Pl. Dep. 99–100). Prior to the end of the shift, Brown prepared a memo for Lewis documenting his conversation with Plaintiff. (Brown Dep. Ex. 1, 2). Lewis returned from vacation to work on Monday, July 20,

2009, and discussed with Plaintiff the information he had received from Brown about her having slept on the job the previous week. (Pl. Dep. 103–05). Plaintiff reported that she had no memory of anything that happened during the prior week's shift, and thus could neither confirm nor deny the reports that she had been sleeping. (Pl. Dep. 104). Lewis indicated that the company would conduct an investigation and interview her the following day. (Pl. Dep. 105).

On July 21, 2009, Plaintiff was interviewed by HR Generalist Montgomery, Blocker and Lewis. Plaintiff reported that she may or may not have slept, as she claimed to have no recollection of any part of her shift on any of the four days aside from arriving and leaving each shift. (Pl. Dep. 108–109, 89–90). She reported that she did not recall feeling drowsy or sluggish (Pl. Dep. 88), nor did she recall any conversation with any of her co-workers. (Pl. Dep. 90). Plaintiff testified that she did not recall asking any of her co-workers about the sleeping once she was made aware of it (Pl. Dep. 100), but that if she had been sleeping, her new medication must have been to blame.[2] (Pl. Dep. 109).

---

[2] In her response, Plaintiff appears to argue that she now does recall the events of over two years ago. She claims that "[e]ach night she felt headaches coming on when she awoke to get ready for work. Ms. Anderson took her first Imitrex shortly after arriving at work the night of July 12. She also took an Imitrex the evenings of July 13, 14, and 15. At the start of the shift on July 16, Mike Brown, the acting head of the team that week, told Ms. Anderson that her eating at the start of the shift was not allowed. Ms. Anderson explained that she had to take her migraine medication with food, but Brown was insistent that she could not eat a snack near the beginning of her shift. (Anderson Dep. 84–89). Brown then, having first had a discussion about eating, proceeded to allege, bizarrely, that Ms. Anderson 'had been observed sleeping four to five hours out of an eight-hour shift for four nights.' (Anderson Dep. 94). Ms. Anderson told him that he must be mistaken and she had no idea what he was talking about. (Anderson Dep. 94)." *See*

Plaintiff was suspended pending completion of the investigation. (Pl. Dep. 115). Montgomery testified that several other team members corroborated Brown's account of Plaintiff's sleeping consistently throughout the first four shifts of the week. (Montgomery Dep. Ex. 6). Montgomery asked Site Nurse Linda Byers to contact Plaintiff to evaluate Plaintiff's contention that if she had been sleeping, her medication was to blame. (Montgomery Dep. Ex. 7). Byers testified that Plaintiff identified two medications she had taken that week, Imitrex and Phenergan. (Byers Dep. 14). Plaintiff's handwritten notes are consistent with Byers' testimony (Pl. Dep. 188, Ex. 14), as Plaintiff also reported to the EEOC that she had been taking Imitrex and Phenergan (Pl. Dep. 169–70, Ex. 10, p. 17). However, Plaintiff's position now is that she never told Byers that she was taking Phenergan, but only that she had been prescribed Phenergan. (Pl. Dep. 188–89). Without resolving Plaintiff's credibility at this stage of the proceeding as to whether she did or did not tell Byers that she was taking Phenergan, the evidence reflects that Byers believed that Plaintiff was taking Phenergan at work. Because the prescription itself advised that a patient should

---

Pl.'s response at 7–8. While in considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Plaintiff has testified that she cannot recall the events of the week of July 12, and that she may or may not have been sleeping, but that if she had been sleeping, it must have been because of her medication. Under F.R.E. 801(d), admissions by a party-opponent are admissible. Plaintiff has disclaimed the argument that her use of Imitrex was protected as a disability under the ADA. Therefore, the cause of her sleeping is not a relevant factual dispute.

6

not drive while taking Phenergan (Pl. Dep. Ex. 9), Byers advised Montgomery that one of the medications she believed Plaintiff was taking during the period in question should not be taken at work. (Montgomery Dep. Ex. 8).

In light of the information gathered in the investigation that Plaintiff had slept on numerous occasions during her shift on four consecutive days, Blocker recommended to his supervisor Bob Stevenson that Plaintiff be terminated. (Blocker Dep. 42–43). Stevenson agreed with the recommendation and Blocker then conferred with HR Director Cary Ashworth, who approved the decision to terminate. (Montgomery Dep. Ex. 7). On July 24, 2009, Blocker, Montgomery and Lewis met with Plaintiff, informed her of her termination and presented her with written notice that indicated she was being terminated for willful neglect of duty for sleeping on the job. (Montgomery Dep. Ex. 7, 11).

On October 2, 2009, Plaintiff filed a charge of discrimination with the South Carolina Human Affairs Commission ("SCHAC") and the United States Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a notice of right to sue on September 17, 2010, and she timely filed this action.

II.  Discussion

   A.  Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the

7

non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

  B. Analysis

    1. Plaintiff's Claims for ADA Discrimination and Retaliation

      a. ADA Discrimination Claim

The ADA prohibits employment discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To establish a prima facie case of employment discrimination based upon a disability, Plaintiff must show:[3] (1) that she was a qualified

---

[3] The Fourth Circuit has used at least two other tests to determine whether a plaintiff has established a prima facie case under the ADA. *See, e.g., Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n. 11 (4th Cir. 2001) ("In a failure to accommodate case, a plaintiff establishes a prima facie case by showing (1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the employer refused to make such accommodations.") (internal quotations omitted); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 197 (4th Cir. 1997) ("To establish a prima facie case under the ADA, Halperin must prove that (1) he has a disability; (2) he is otherwise qualified for the job in question; and (3) he was discharged solely because of his disability."). The *Rhoads* court distinguished between wrongful discharge and failure to accommodate claims arising under the ADA and noted corresponding, slightly different prima facie tests for each. Plaintiff appears to allege both failure-to-accommodate and wrongful discharge, and the

individual with a disability; (2) that she was discharged; (3) that she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) that the circumstances of her discharge raise a reasonable inference of unlawful discrimination. *See Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 n. 9 (4th Cir. 2004); *Haulbrook v. Michelin N. Am.*, 252 F.3d 696 (4th Cir. 2001).

In pretext cases, the plaintiff seeks to prove that the defendant's proffered non-discriminatory reason for an adverse employment action was, in reality, a pretext for a decision motivated by discriminatory reasons. Under the mixed-motive analysis, the issue is whether a plaintiff's disability "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. Sec. 2000e-2(m).  Under either method, Plaintiff's case fails.

In the mixed-motive analysis, Plaintiff must demonstrate that the fact of her migraines was a motivating factor in Defendant's terminating her. The evidence that Plaintiff points to as supporting her claim that her migraines were a motivating factor is: (1) beginning in June 2009, Plaintiff's direct supervisor Lewis expressed frustration with the impact that her illness was having on his ability to staff his team; (2) his calls to her to determine whether she planned to report to work included calls late at night that woke her and her family; and (3) he told her that she needed to come back to work because other employees had upcoming vacations. (Plaintiff Dep. 66). Additionally, he told her that he was not concerned with her

---

undersigned finds the *Rohan* test accounts for both types of claims and that adoption of the other tests fares Plaintiff no better.

medical condition, "and he did not need that excess information. His concern was to cover his shift." (Plaintiff Dep. 211–212). He considered the approved absence to be "absenteeism." (Lewis Dep. Exh. 2).

The court assumes, without deciding, for the purposes of this motion that at the time of her termination, Plaintiff's migraines constituted a cognizable disability under the ADA. Conceding that her termination was an adverse action, Plaintiff cannot establish a prima facie case of ADA discrimination because she lacks proof that her termination occurred under circumstances that give rise to an inference of unlawful discrimination. The basis for Plaintiff's termination was that she was sleeping on the job. There is no evidence linking her sleeping on the job to her migraines.

While Plaintiff inconsistently has asserted that she recalls having taken Imitrex at the beginning of her shifts during the week of July 13, 2009, she also has testified that she cannot remember what happened during the shifts and neither reported feeling groggy or disoriented. (Pl. Dep. 88–90). Plaintiff has not submitted any information about Imitrex to suggest that prolonged periods of sleeping without grogginess or disorientation and with the ability to wake up and function normally with no signs of impairment is a known or reported side effect. Despite retaining two experts in this case, Plaintiff has not offered any medical testimony establishing any link between Imitrex and involuntary sleeping.

The case law within the Fourth Circuit establishes that an employee is not insulated from the consequences of workplace misconduct merely because such misconduct is caused by a disability. Specifically, the Fourth Circuit Court of Appeals has held that

"misconduct—even misconduct related to a disability—is not itself a disability, and an employer is free to terminate an employee on that basis." *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n. 3 (4th Cir. 1997) (*citing Tyndall v. National Educ. Ctrs.*, 31 F.3d 209, 214-15 (4th Cir. 1994) (firing for disability-related absences permitted); *Little v. Federal Bureau of Investigation*, 1 F.3d 255, 259 (4th Cir. 1993) (firing for disability-related intoxication on the job permitted).

Even if Plaintiff had been sleeping on the job because she took Imitrex, Defendant is under no obligation to excuse the sleeping, as sleeping on the job is deemed willful neglect of duty under its policy. (Blocker Dep. Ex. 4, Montgomery Dep. Ex. 11.) Termination for misconduct is not discrimination under the ADA, regardless of what the relationship might be between the misconduct and some underlying disability. "There is a distinction between taking an adverse [action] for unacceptable misconduct and taking such action solely because of a disability, even if the misconduct is 'caused' by the disability." *Martin v. Barnesville Exempted Village Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 (6th Cir. 2000) (citing *Maddox v. University of Tennessee,* 62 F.3d 843, 847 (6th Cir. 1995)); *see Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998) ("The ADA does not insulate [employees from] emotional or violent outbursts blamed on an impairment."); *see, e.g., Seitz v. Lane Furniture Indus.*, 2008 WL 4346439, at *14–15 (N.D.Ohio Sept. 17, 2008) (discharge of employee suffering from alcoholism for repeated customer complaints was a legitimate reason despite the fact that the poor performance was the result of alcoholism).

Even if the court assumes that the prima facie case is satisfied, Plaintiff cannot

11

overcome her burden under *McDonnell-Douglas*. Defendant has offered a legitimate reason for terminating Plaintiff because of its belief that she was sleeping during her shifts, which under Defendant policy constitutes a willful neglect of duty. Because Defendant has offered a legitimate, non-discriminatory reason for termination, Plaintiff must establish pretext. In other words, Plaintiff must summon "sufficient evidence from which a jury could conclude that [Defendant] did make its employment decision based on [Defendant]'s status as disabled despite [Defendant]'s proffered explanation." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003).

Plaintiff attempts to show that Defendant's nondiscriminatory reasons for her termination are pretextual by relying on her own opinion. However, the Fourth Circuit has repeatedly explained that "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) (internal citations omitted). Accordingly, Plaintiff's perception of herself is not relevant. To the extent that Plaintiff's proffered hearsay testimony that another employee told her that she was "being watched closely because of her absence," such hearsay evidence is inadmissible and it further fails to prove as a reasonable probability that Defendant's belief that she had been sleeping on her shifts was either false or pretextual for disability discrimination. *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (employee must present evidence reasonably calling into question the honesty of his employer's belief; employee's mere demonstration that his employer's belief may be incorrect is not sufficient to prove discrimination).

Further, Plaintiff has set forth no evidence indicating her termination was related to her migraines. Evidence of pretext that is merely colorable or suggests a good faith error on the part of the employer, rather than a false explanation, is not sufficient. *Price v. Thompson*, 380 F.3d 209, 216–17 (4th Cir. 2004).

Plaintiff herself does not argue that sleeping on the job is not a serious violation of Defendant policy. Defendant, through Lewis, Montgomery and Blocker, conducted a thorough investigation of the allegations about Plaintiff's sleeping. (Montgomery Dep. Ex. 6, 7). Whether Defendant chose to discipline Plaintiff for having slept one shift or four consecutive shifts is irrelevant. The issue is not whether Defendant was wise or generous in its supervisor's management practices, as employers' wisdom or competence is not the salient issue. "Title VII is not a vehicle for substituting the judgment of a court for that of the employer." *Jiminez v. Mary Washington College*, 57 F.3d 369, 377 (4th Cir. 1995). Courts do not sit as "super personnel departments second guessing an employer's perceptions of an employee's qualifications." *Malghan v. Evans*, 118 Fed.Appx. 731 (4th Cir. 2004), (citing *Smith v. University of North Carolina*, 632 F.2d 316, 346 (4th Cir.1980).). In fact, "the law does not require an employer to make, in the first instance, employment choices that are wise, rational, or even well-considered, as long as they are nondiscriminatory. *Id., citing Powell v. Syracuse Univ.*, 580 F.2d 1150, 1156–57 (2d Cir. 1978). Plaintiff has presented no evidence that Defendant's decision to terminate her was other than because of its belief she was sleeping during her shifts.

The court's only concern is:

13

>whether the reason for which the defendant discharged the plaintiff was discriminatory. Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.

*DeJarnette*, 133 F.3d at 299, (citing *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410–411 (7th Cir.1997)); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) ("[I]t is for [the employer], not the courts, to rule on the wisdom and generosity of [its supervisors'] management practices."). The issue is whether Defendant's termination of Plaintiff was in violation of federal anti-discrimination laws.

Brown was Plaintiff's temporary supervisor during the night shift week at issue. Although the parties spend a great deal of time arguing about whether Brown was a supervisor with actual supervisory authority or not, it does not appear to be an argument that makes any difference. The record is devoid of any evidence that Brown was aware or would have cared that Plaintiff's prior absences were covered by the FMLA or that he knew that Plaintiff considered her headaches to be a disability under the ADA. Any generosity by Brown in not confronting Plaintiff about her sleeping during the first four nights would rebut rather than support the claim that Brown had a discriminatory or retaliatory animus toward Plaintiff.

Next, Plaintiff argues that her sleeping on the job was not the true reason for her termination because Defendant faulted her for failing to disclose the medications she was prescribed on July 10th, even though Defendant policy at that time did not expressly require such notice. (Montgomery Dep. 37–38). Again, this argument is a red herring as far as

Plaintiff's pretext argument is concerned. Whether or not a written policy required notification of medications is irrelevant to whether Defendant terminated Plaintiff because she slept on her shifts and is insufficient to establish pretext.

There is substantial evidence that Defendant has a policy of treating sleeping on the job as a serious offense for which termination is a possible consequence, which the company applied in this case. The record reflects Defendant, through Lewis, Stevenson and Montgomery, previously terminated a Process Technician for a single instance of sleeping on the job. (Blocker Dep. 81–82; Ashworth Aff., Ex. A). Most importantly, the record is devoid of evidence that the decision to terminate Plaintiff was motivated by an animus towards the disabled. "[T]he ADA was designed to assure that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps." *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 200 (4th Cir. 1997), *overruled on other grounds by Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999). Despite the creative arguments of Plaintiff's counsel, nothing in the record indicates that those interests are at play here. Based on the admissible evidence in the record, no reasonable jury could find that Defendant terminated Plaintiff's employment because of her migraines. Accordingly, there is no genuine dispute as to any material fact and Defendant is entitled to judgment as a matter of law.

      b.  ADA Retaliation Claim

For her retaliation claim, Plaintiff asserts that Defendant discriminated against her by terminating her and denying her appeal because she made a charge, assisted, and/or

participated in an investigation of ADA allegations. To establish a prima facie case of retaliation under the ADA, Plaintiff must show: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action. *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 392 (4th Cir. 2001). "Protected activity" under the statute falls into one of two categories: opposition or participation. *Crawford v. Metro. Gov't of Nashville & Davidson County*, 555 U.S. 271 (2009). To establish that she engaged in protected opposition activity, a plaintiff must show that she opposed an unlawful employment practice which she reasonably believed had occurred or was occurring. *See Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003). Participation, which receives broader protection than opposition conduct, includes: "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing" under federal employment discrimination laws. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (Title VII).

     Plaintiff appears to complain that she was retaliated against for asking to take leave to pursue alternative medications. The Complaint contains no allegations indicating that she engaged in any activity protected by a federal employment statute prior to her termination. Nor did the arguments contained in the briefs or at oral argument expand on the alleged protected activity. *See, e.g., Hindman v. Greenville Hosp. Sys.*, 947 F.Supp. 215, 224 (D.S.C. 1996) (stating that the requisite causal connection can be shown only if the protected activity preceded the alleged retaliatory conduct). To the contrary, the record reflects

Plaintiff was not ever denied FMLA leave prior to being terminated for sleeping on the job.

### 2. Plaintiff's FMLA Claims for Entitlement and Retaliation

Next, Plaintiff contends that Defendant violated the FMLA by denying her FMLA leave for her disability. From the argument of counsel at the hearing and her subsequent supplemental memorandum [Entry #45], it appears that Plaintiff rests her FMLA claim on her request at termination to be allowed time to consult with her doctor about alternative, appropriate medical treatments.

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). Such a claim generally requires proof of five essential elements: (1) plaintiff was an "eligible employee"; (2) defendant was a "covered employer"; (3) plaintiff gave adequate notice of the need for protected leave; (4) the requested leave was for a qualifying reason; and (5) plaintiff was terminated in violation of the Act. In her FMLA retaliation claim, Plaintiff argues that she engaged in protected activity by requesting FMLA leave and that she was terminated as a result. Neither her FMLA entitlement nor her retaliation claim survives summary judgment.

Plaintiff was approved for intermittent leave in January 2009, and first requested leave in June 2009, (Pl. Dep. 42-43) when she was granted leave for nearly two weeks. (Pl. Dep. 73-74.) From the day she returned to work on July 6, 2009, through the day she was suspended for sleeping on the job, July 21, 2009, Plaintiff worked her regular schedule without ever requesting days off to see her doctor. Plaintiff was terminated three days after

she was suspended. In an attempt to contest her termination, Plaintiff requested that she be given an opportunity to consult with her doctor to find a medication for her migraines. However, by that point of termination, a request for accommodation has no bearing. (Pl. Dep. 214 ("And when I requested accommodation . . . it was not granted, because I was terminated.").).

Plaintiff cannot recast her termination as an FMLA failure-to-accommodate or retaliation claim. The record reflects Plaintiff was not ever denied FMLA leave prior to being terminated. Once terminated, she was not an "eligible employee" under the FMLA entitled to leave.

III.   Conclusion

For the foregoing reasons, the undersigned recommends that Defendant's motion for summary judgment [Entry #32] be granted.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

November 14, 2011                              Shiva V. Hodges
Florence, South Carolina                       United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**