UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Natasha Anderson, ) | Civil Action No.: 4:10-2792-RBH |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| ) | **ORDER** |
| Roche Carolina, Inc., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

The plaintiff filed this action on October 29, 2010 alleging causes of action for violations of the Americans with Disabilities Act (ADA)[1], 42 U.S.C. § 12101, et seq. and the Family Medical Leave Act (FMLA)[2], 15 U.S.C. § 1681b against her former employer, Roche Carolina, Inc. and a human relations employee, John Farmer.  Farmer was dismissed by stipulation of the parties.  Before the Court for consideration is the Defendant's Motion for Summary Judgment.

This matter is now before the undersigned for review of the Report and Recommendation ("the Report") filed by United States Magistrate Judge Shiva V. Hodges, to whom this case had previously been assigned pursuant to 28 U.S.C. § 636 and Local Rule 73.02(B)(2)(g).  In her Report, Magistrate Judge Hodges considers the issues and recommends that the motion be granted on all claims.  Plaintiff filed objections to the Report on November 30, 2011.  Defendant filed a Reply to the objections on December 17, 2011.

---

[1] The First Cause of Action is for both alleged discriminatory discharge of a disabled individual under the ADA and also failure to accommodate the disability under the ADA.  The Second Cause of Action is for retaliation under the ADA.

[2] The Third Cause of Action is for wrongful denial of FMLA benefits.  The Fourth Cause of Action is for retaliation under the FMLA.

In conducting its review, the Court applies the following standard:

> The Magistrate Judge makes only a recommendation to the court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with the court. Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The court is charged with making a de novo determination of those portions of the Report to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).
>
> The court is obligated to conduct a de novo review of every portion of the Magistrate Judge's report to which objections have been filed. Id. However, the court need not conduct a de novo review when a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). In the absence of a timely filed, specific objection, the Magistrate Judge's conclusions are reviewed only for clear error. See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005).

**Legal Standard for Summary Judgment**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of proving that judgment on the pleading is appropriate. Once the moving party makes the showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue

of material fact." Temkin v. Frederick County Commrs, 845 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986)). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

Moreover, "once the moving party has met its burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry, Inc., 877 F. Supp. 1002, 1005 (E.D. Va 1995). Rather, the nonmoving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, 977 F.2d 872, *citing* Celotex Corp., supra. Moreover, the nonmovant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993); DeLeon v. St. Joseph Hosp., Inc., 871 F.2d 1229, 1223 n. 7 (4th Cir. 1989). Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987); Evans v. Techs. Applications & Servs. Co., 875 F. Supp. 1115 (D. Md. 1995).

**Facts**

The Court will summarize the facts viewing the evidence in a light most favorable to the plaintiff without making credibility determinations. The plaintiff (Anderson) was hired by the defendant (Roche) in September of 2006. At the time of her discharge in July of 2009, she held the position of Process Technician II. Her direct supervisor was James Lewis (Lewis). Mike Blocker

3

(Blocker) supervised the team leaders such as Lewis. Plaintiff Anderson had been treated for migraine headaches since about 2004, before her employment with Roche. At Roche, she had previously had "a couple of incidents at work where it just came on and I was a little disoriented and I had to go to medical." (Dkt # 35, p. 37; Anderson Depo., p. 36). She consulted a physician about the migraines and was approved by Roche for intermittent leave under the FMLA in March of 2009. (Dkt. #36-4, p. 14). The "Employer Request of Family Medical and/or Personal Leave Form provides :

> "You will be required to furnish periodic reports of your status and intent to return to work every 30 days while on a Personal Medical Leave. You will be required to submit medical certification indicating you are fit to return to work after a Personal Medical Leave. . ."

With regard to the events leading to her termination, Anderson testified that she took FMLA leave due to migraines for the work days between June 24 and June 30, 2009. She called Lewis each work day and notified him that she would not be coming to work. She testified that Lewis called her at home during the week of June 24th late at night during third shift (11:30 p.m) concerning how to code her absence on her timesheet. He called her twice on her cell phone which she had on silent and once on her house phone. She told him that she did not appreciate him calling her at a late hour and awakening her. On the morning of June 30, she informed him that she had a doctor's appointment at 3:00 p.m. that day and that she would therefore not be at work that day. (Her shift was to start at 3:00 p.m.) She told him that she would call after her doctor's appointment to let him know her prognosis. On June 30, Lewis called her at 8:00 p.m.[3] after he had failed to hear from her regarding the results of the doctor's appointment. She was just getting home from the doctor's appointment after getting her prescription filled. She explained to him that she had been prescribed two narcotic medications and

---

[3] Plaintiff also stated that Lewis had called her house phone and her cellular phone several times before 8:00 p.m. She testified that he called her about ten times between June 24 and June 30. (Dkt # 35, Depo. p. 81).

that the doctor wanted her to stay out of work until July 6.  Lewis told her that someone on her crew was going on vacation and "he really needed me to be back on shift.  And that was basically his only purpose for the phone call, is how to cover his shift."  (Dkt # 35, p. 67; Dep. p. 66.)  Anderson told him that she had been approved for FMLA leave, a situation of which he was not aware.  Lewis told her that FMLA was not his concern because he does not handle FMLA. Anderson further stated that "[h]e did not order me to come back to work, but I could tell by his tone and the way the conversation ended that he was agitated that I would not be . . . back at work until the 6th."  (Id., p. 70; Depo. p. 69)

Plaintiff telephoned the company nurse, Ms. Linda Byers, on Sunday, July 5 to let her know she would be back at work on Monday, July 6.  Plaintiff told her that her doctor had not put her on any work restrictions and that she was not taking any medications.  Plaintiff brought Byers a doctor's excuse. Plaintiff worked during the week of July 6 without taking medication and only experienced low-grade headaches.

Plaintiff had complained to Blocker about Lewis bothering her while she was out sick, and on July 7 he called her to his office. Ms. Carla Montgomery, HR Generalist, was also present.  At that meeting, she told Blocker and Montgomery about the calls that she had received from Lewis and that "I felt like I really wasn't covered under my FMLA because I just kept getting calls over and over again."  (Dkt # 35, p. 81, Depo. p. 80).  She stated that Lewis "told me after repeated calls that he was not concerned with my medical condition, and he did not need that excess information.  His concern was to cover his shift."  (Dkt # 35, p. 213; Depo., p. 212.) She "expressed to them that I wanted to work, but I also need relief for my headaches, for my migraines, and that my doctor was working with me to get me some relief for that.  I just needed time to work through that." (Dkt # 35, p. 83, Depo. p. 82). She also requested the accommodation of being allowed to eat a small snack or have a break if she felt a migraine coming on.  (Dkt # 32-4, p.19; Depo. p. 173).  She stated that Blocker told her that

5

Lewis was just trying to cover his shift but that they would talk to him about a better procedure to follow in the future.

On July 10, she met with the company's on site physician, Dr. Carolyn Reynolds, concerning the migraines and the requested accommodations, including "the time to find the right medication". (Anderson Affidavit, ¶ 3).

On the afternoon of July 10, Anderson saw her regular doctor, Dr. Patrick Jebaily. At the appointment, he prescribed a new medication, Imitrex, 100 milligrams, for the migraines. She started taking the Imitrex on July 12. (Dkt # 35, p. 85, Depo., p. 84). She came into work on third shift on July 12 at 11:00 p.m. She took the Imitrex at approximately 11:30 or 11:45 p.m. The Imitrex appeared to work because she does not recall having any headaches on that shift. During that week, she took one Imitrex per night after the shift change with a small snack for four nights. She did not take one on the fifth night of that week. (Dkt # 35, p. 87, Depo. p. 86). Counsel for Roche asked her if she felt drowsy or sluggish after taking the Imitrex. She stated that she did not remember.

> Q. When you say you don't remember, you mean you had a void in your memory or you just, sitting here today, you don't recall how you felt?
> A. I have a void in my memory for that entire time.

Dkt # 35, p. 90, Depo. p. 89.

Lewis was on vacation that week, and Mike Brown supervised Plaintiff while he was away. On the last day of the week, July 16, Brown, called her to his office and told her that "[t]he eating has to stop." (Dkt Entry # 35, p. 94, Depo. p. 93). She explained that she needed to eat a small snack with her medicine. He also told her that the sleeping had to stop and that she had "been observed sleeping four to five hours out of an eight-hour shift for four nights."[4] (Dkt # 35, p. 95, Depo. p. 94). She stated

---

[4] Roche Policy No. 16 Discipline classifies offenses "of a more serious nature and which will generally warrant initial discipline such as suspension and/or immediate disciplinary termination"

6

that she was puzzled by the statement because she did not know that she had been sleeping. She also said that no one had spoken to her until then about sleeping. She told him that one of her co-workers, Casey Terry, had told her on July 6 when she returned to work that "they would be watching me more closely, so just be careful." (Dkt # 35, p. 96, Depo. p. 95). In her affidavit, Anderson states that "[e]very time I worked third shift, I would see team members with their heads down and eyes closed." (Dkt #34-2, p. 3). She further states that Brown told her that he "had been caught sleeping on third shift repeatedly." Id. She also states that the other employees were not disciplined for their sleeping.

She attempted to speak with Blocker the next morning at the end of her shift, but he was not at work. On Monday of the following week she again tried to talk to him, but he was not in his office. She worked her normal shift and did not take Imitrex that day. At about 10:00 p.m., Lewis called her to his office. He told her that he had been in meetings all day concerning her. He told her to come to a meeting on Tuesday with himself, Blocker, and Montgomery. He also told her that he did not mean any harm in making the telephone calls to her, and she believed that he was being sincere. Lewis also told her that he was going to have to dock her pay because of a "safe work permit" that she had written incorrectly. She stated that she had received no training on writing these permits but that she believed that she was preparing them correctly.

Present at the meeting the next day, July 21, were Anderson, Lewis, Montgomery, and Blocker. Blocker asked her to explain her sleeping on the job. She stated that she explained that she did not recall sleeping but that she had started a new medication that week; that she needed to take it with a small snack; and that Mike Brown had told her she could not take a break. She was then asked if the medication had been cleared by medical. She told him that it had not because her doctor had told her

---

including "willful neglect of duty (including but not limited to, sleeping on the job)." (Dkt # 36-2, p. 15).

that she should be able to work while taking it. They told her that there was a policy that new medications must be disclosed. She told them that she was alarmed by the fact that she had apparently lost about 20 hours total and that "the only way that I could have lost any time like that is because of this new medication that I have never been on." (Dkt # 35, p. 112; Depo., p. 111). She stated that, if someone had told her that she was sleeping, she would have stopped taking the Imitrex and consulted her doctor, which was what she did after she learned of the problem. She also again requested the accommodation of being given time off to get her medicine regulated and to be allowed to have a snack and break when the migraines came on. (Dkt # 32-4, p. 20, Depo., p. 174).

Her doctor's office was not able to give her an appointment until shortly after the meeting with Blocker, so she asked Roche for time for her doctor to work with her to get on the right type of medicine since she had only been taking the Imitrex for a week. The Roche officials told her that "because I had not disclosed the medication per Roche policies, that would not be a consideration for me sleeping, although it could have caused me to sleep." (Dkt #35, p. 116, Depo. p. 115). She was suspended for three days while an investigation was performed. During the three-day suspension, Anderson received a call from Linda Byers, the company nurse, inquiring what medications she had been prescribed when she went to the doctor. Anderson told her that she was taking a new medication, Imitrex, and that the doctor had also given her a refill prescription for Phenergan, a nausea medication. (Dkt #32-4, p3; Depo. p. 125). She stated that she never took the Phenergan while she was working. However, she said that she was not sure if she told Ms. Byers this because her question was what medications had been prescribed for her.[5]

---

[5] Roche contends that Anderson told Nurse Byers and included in her own handwritten notes that she took both Imitrex and Phenergan but that she later changed her story. See footnote 5 of Reply to Objections.

She was told to meet the Roche officials at 3:00 pm on July 24. At the meeting, they told her that she was being terminated for sleeping on the job, taking medicine that she knew would make her sleepy, and failing to have the medicine cleared by medical staff before taking it.[6] (Dkt #35, p. 130; Depo., p. 129). She again requested accommodations and refused to sign the termination paper because she believed that it contained incorrect information. The termination paper referenced the policy against sleeping on the job and also referenced a verbal warning in 2007 for sleeping on the job. (Docket Entry # 32-13, 32-8, p. 17). It did not mention the alleged policy concerning disclosure of medication.

Dr. Patrick Jebaily states by way of affidavit that Imitrex can cause drowsiness, although it does not have that effect for most patients. He further states: "It is also not medically unreasonable given its chemistry, to conclude that Imitrex could cause other symptoms related to brain functions, including memory loss."[7] (Dkt # 34-1, p. 3). He also indicates that he later prescribed a medication called Topamax 50 mg that controls the migraines and allows Anderson to work.

After the termination, HR representative Montgomery prepared typewritten notes regarding the suspension meeting. In those notes, she states, "I asked her to clarify that she was on a medication that makes her sleepy. She indicated that she was. I asked if Linda had cleared the medication, and she said no."

Plaintiff pursued the company grievance process and subsequently filed a complaint with the

---

[6] The Roche site manager, Hans Groeger, sent an e-mail on August 26, 2009 documenting his investigation of Anderson's termination and stating as justification the sleeping on the job, failure to disclose the new medication, and alleged admission by Anderson of her actions. (Dkt #36-8, p. 18).

[7] Defendant contends that treating physician Dr. Jebaily is now being presented by Plaintiff as a Tier I expert who had not been previously disclosed as such since his expert testimony goes farther than simply his treatment of Plaintiff.

9

South Carolina Human Affairs Commission (SHAC).  The company's position paper before SHAC, prepared by its attorney and approved by company officials, stated inter alia that "Roche terminated Ms. Anderson because she ignored strict Company policies that require employees to report medication that could alter their work performance and that prohibit sleeping during a shift."  (Dkt  #37-5, p. 19; letter, p. 9).   During the course of this litigation, however, Roche officials admitted that the policy regarding disclosure of medications had not even been adopted until after Anderson's termination.  It also appears from the record that there may have been some confusion about her previous FMLA certification at the time of her termination.  (See Plaintiff's Brief in Opposition to Motion for Summary Judgment at p. 33.)

**Grounds for Defendant's Motion for Summary Judgment**

Defendant has moved for summary judgment on the following grounds:

A.  Anderson Cannot Establish a Prima Facie Case of Discrimination Under the ADA;
B.  Anderson Cannot Establish That Roche's Explanation for her Termination Was Pretextual, and Thus Cannot Establish Discrimination Under the ADA or Unlawful Retaliation Under the ADA or the FMLA.
C.  Roche Did Not Deny Anderson A Reasonable Accommodation; and
D.  Roche Did Not Deny Anderson Any Requested FMLA Leave.

Dkt. #32-1, p. 10.

**AMERICANS WITH DISABILITIES ACT CLAIMS**

**I. Disparate Treatment Claim under the ADA**

**A. McDonnell-Douglas Analysis.**  In order to establish a prima facie case under the ADA, the plaintiff must show that: (1) she is a qualified individual with a disability; (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination.  Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 n. 9 (4th Cir. 2004). Magistrate Judge Hodges found that the plaintiff has not

met the fourth element of the prima facie case, that her discharge raises a reasonable inference of unlawful discrimination.[8] She also found that, even if the plaintiff has satisfied the prima facie case, then she has not shown pretext under the shifting burdens of McDonnell-Douglas. With regard to a showing of pretext, "[w]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147-48 (2000).

In support of the fourth element of the *prima facie* case, the plaintiff asserts the following evidence: comments by the supervisor, Lewis, in the telephone calls; the warning from the co-worker, Casey Terry, that Defendant would be watching her; and the "fabricated policy". Plaintiff asserts that the Terry evidence is admissible as an admission under Fed. R. Evid. 801(d)(2) or as a statement of intent, plan, motive, and design under Rule 803(3). Finally, Anderson emphasizes Roche's repeated reference to a policy requiring disclosure of medications by employees, a policy that was not adopted until two months after Anderson's termination. In attempting to show that the employer's legitimate, nondiscriminatory reasons for the discharge were pretextual, Anderson refers to the above evidence as well as allegedly similarly situated employees who engaged in misconduct but who were not terminated.

Defendant asserts that discriminatory intent cannot be shown by the fact the supervisor contacted an employee on leave about when she planned to return. Roche also points out that these

---

[8] Roche does not contest the other elements of the prima facie case and thus does not take the position here that migraine headaches were not qualified disabilities under the Act. See Memorandum in Support of Motion for Summary Judgment, page 10. ("Assuming arguendo, that Anderson had a cognizable disability under the ADA at the time of her termination, and conceding that her termination was an adverse action, Anderson nevertheless cannot establish a prima facie case of ADA discrimination.")

11

contacts were made before Lewis knew about the FMLA leave that had been approved and that, once Anderson made him aware of her doctor's advice, he did not contact her again for the remainder of her leave. As to the alleged out of court declaration by the co-worker that Anderson was being watched, Defendant states that Terry has been listed as a witness since the beginning of the case, but Anderson has neither deposed him nor obtained an affidavit from him. Roche contends that Rule 801(d)(2)(D) requires a statement by a party's agent to be made "concerning a matter within the scope of the agency or employment" and that Terry, who was not a member of management, was not speaking about a matter within the scope of his employment. Roche also contends that Anderson raised her argument regarding intent, plan, motive, and design for the first time in her objections and that the rule refers to the declarant's state of mind and not the state of mind of Roche. As to the "fabricated policy", Roche admits that it erroneously stated in its initial position statement to SHAC that the non-disclosure of medications violated a written company policy. However, Roche contends that it has always asserted Anderson was discharged for sleeping on the job as stated in the written termination paper and that sleeping on the job is considered to be wilful neglect of duty under company policy. (Blocker Depo. Ex. 4, Montgomery Dep. Ex. 11). Finally, Defendant contends that the plaintiff has not shown any valid comparators.

Assuming without deciding that Anderson has presented sufficient evidence for a prima facie case, the Court finds that she has not established pretext. As to the telephone calls by Lewis, Plaintiff later stated that she did not believe that he meant her harm, thus acknowledging he harbored no discriminatory intent. (Dkt. # 35, p. 107, Depo. p. 106). The alleged warning from the co-worker, Terry, was inadmissible hearsay for the reasons argued by the defendant. The defendant's verbal reliance on the non-existent policy requiring disclosure of medications cannot be used as evidence of pretext because it was not inconsistent with the justification for the discharge of the plaintiff having

been seen sleeping on the job. When the reasons given by an employer change over time but are not inconsistent, pretext has not been shown. Holland v. Washington Homes, Inc., 487 F.3d 208, 217 n. 7 (4th Cir. 2007). See also, Hunnicutt v. S.C. Dept. of Revenue, 2010 WL 1344352 (D.S.C. Mar. 31, 2010) ("inconsistent explanations of employment actions are probative of pretext, [but] different or varying explanations that are not materially inconsistent are not.").

Additionally, Anderson's comparator evidence is inadequate to establish pretext. Anderson alleges that she routinely saw other employees on third shift with their "heads down and eyes closed" and that these employees were not disciplined.. (Anderson Affidavit, ¶ 12, 14). However, Anderson does not indicate the names of the other employees, whether supervisors were made aware, and whether the employees were sleeping and if so for how long.

> When a plaintiff bases her discrimination claim on a similarly situated comparator, it is the plaintiff's "task to demonstrate that the comparator is indeed similarly situated." Haywood v. Locke, 2010 WL 2711294 (4th Cir. July 6, 2010) (citing Tex. Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981). "Plaintiff [is] required to show that they are similar in all relevant respects to their comparator. Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Id.

"The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008). The above evidence would not be sufficient to establish a valid comparator. Anderson also alleges that Mike Brown told her he also slept on the job and that he was taken off of third shift because he could not stay awake. Such statements are inadmissible hearsay as argued by the defendant.

Another incident relied on by the plaintiff is the consumption of alcohol by Brown and another Process Technician three years earlier during their lunch break and returning to work. Both employees were suspended and not fired. Anderson asserts that this is a valid comparison to her situation because

it involved "being under the influence of a drug in the workplace." (Objections, p. 22). This conduct was not similarly situated under the above standard. Plaintiff was seen sleeping while on the job, and the other two employees were drinking off the premises. Although some employers would issue the same discipline for both incidents, or harsher discipline for alcohol consumption than sleeping on the job, the Court does not sit as a "super personnel department." DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998).[9]

On the basis of the above McDonnell-Douglas analysis, the disparate treatment claim under the ADA cannot go forward.

**B. Mixed Motive Analysis of ADA Disparate Treatment Claim**

"[I]f a plaintiff claiming discrimination under § 12132 demonstrates that his or her disability played a motivating role in the employment decision, the plaintiff is entitled to relief." Baird v. Rose, 192 F.3d 462, 470 (4th Cir. 1999).[10] In the instant case, the plaintiff relies on the telephone calls by Lewis to Anderson, including the comments that he was not concerned with her medical condition and that he was attempting to cover his shift. The Court has already noted above that Anderson later disavowed any discriminatory intent by Lewis. Therefore, this evidence would not establish mixed motive. The only other evidence relied upon by the plaintiff[11] was the hearsay statement by the other

---

[9] Defendant asserts that a more appropriate comparator was a Process Technician who was terminated for sleeping on the job, previous disciplinary actions of insubordination, and safety policy violations. Defendant contends that, unlike Brown, this employee engaged in the same behavior as Anderson, citing Ashworth Affidavit and Blocker Dep. 81-82).

[10] Under a mixed motive theory, damages may not be awarded if the defendant shows that it would have taken the same action in the absence of the impermissible motivating factor. In such circumstances, relief is limited to declaratory and injunctive relief, costs, and attorney's fees.

[11] See Plaintiff's Memorandum in Opposition to Motion for Summary Judgment, Dkt. #34, p. 14.

employee that management would be watching her. As discussed above, this statement is not admissible. Therefore, the plaintiff's ADA disparate treatment claim cannot go forward on the basis of mixed motive analysis.

## II. ADA Accommodation Claim

Plaintiff also alleges in her first cause of action under the ADA a failure to accommodate claim. The prima facie case for a plaintiff's ADA claim based on the employer's failure to accommodate the employee's disability comprises the following elements: "(1) that (he) was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position. . . ; (4) that the [employer] refused to make such accommodations." Rhoads v. Federal Deposit Insurance Corporation, 257 F.3d 373, 387 (4th Cir. 2001)[12], citing Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2nd Cir. 1999). See 42 U.S.C. § 12112(b)(5)(A), defining "discrimination" as including the failure to "make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]". The term "reasonable accommodation" is defined in 29 C.F.R. § 1630.2(o)(1), inter alia, as "(ii) [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or (iii) [m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of

---

[12] The plaintiff in Rhoads suffered from migraine headaches and asthma and was at times unable to work or care for herself. The Court found that she had failed to show that she was substantially limited in her ability to work. Rhoads was decided prior to the 2008 amendments to the ADA.

employment as are enjoyed by other similarly situated employees without disabilities." Reasonable accommodations may include "[j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modification of equipment or devices . . . appropriate modification of . . . policies . . . and other similar accommodations for individuals with disabilities." 29 C.F.R. § 1630.2(o)(2)(ii).

The regulations further provide that "to determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). In Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 Fed. Appx. 314, 2011 WL 1491230 (4th Cir. April 20, 2011, unpublished), the court quoted the Seventh Circuit regarding the interactive process:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135-36 (7th Cir. 1996).

The Court finds there are disputed issues of fact as to whether both parties met their burdens of engaging in the interactive process in good faith and whether that caused a failure to accommodate the disability. The evidence could support a finding that Anderson and Roche were engaged in an interactive process of addressing the migraine condition. That process began in January of 2009 when the company sent the letter requesting that she apply for intermittent leave. It continued into March

2009, when the leave was approved and into June and early July of 2009 when she took FMLA leave. The process continued with conversations among Anderson, Blocker, Montgomery and Reynolds during the July 6, when she requested time to work with her doctor to obtain relief for the migraines and also to be allowed to eat a small snack or have a break if she felt a migraine coming on. She further testified that she requested accommodations including time to find the right medication in the meeting on July 10 with the company's on-site physician, Dr. Carolyn Reynolds. Finally, she testified that she again requested the accommodations at the "suspension meeting" on July 21. Viewing the evidence in a light most favorable to the plaintiff, instead of accommodating her disability, Roche terminated her employment on July 24. In the words of the Fourth Circuit in Crabill, there is sufficient evidence to create a jury question as to whether the failure of Roche to engage in the interactive process "resulted in the failure to identify an appropriate accommodation." 423 Fed. Appx. at 323.[13]

**III. ADA Retaliation Claim**

Magistrate Judge Hodges found as to the ADA retaliation claim that summary judgment should be granted because Anderson has not shown that she engaged in a protected activity before her termination. See R&R, p. 16. The Court agrees that the plaintiff has presented no evidence showing that she was terminated for either opposing an unlawful employment practice or participation by making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing. Therefore, the retaliation claim under the ADA is dismissed.

---

[13] The employer is not required to provide the employee the accommodation which she requests or prefers but only "some reasonable accommodation." Crabill, 423 Fed. Appx. at 323, citing Crawford v. Union Carbide Corp., 202 F.3d 257 (4th Cir. 1999) (unpublished) (quoting Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 633 (7th Cir. 1998).

**FMLA CLAIMS**[14]

**I. FMLA Entitlement Claim**

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's rights under the Family Medical Leave Act. 29 U.S.C. § 2615(a)(1). Viewing her entitlement claim in a light most favorable to the plaintiff, the evidence shows that Anderson's request for intermittent leave was approved in March of 2009. She took intermittent leave under the FMLA in June of 2009. There appears to be a factual dispute as to whether Plaintiff later made other requests for leave, including one on July 7 and another on July 21 (both dates prior to her termination) and at the termination meeting on July 24. Again, there appears to be some evidence of a miscommunication or confusion about her having a previous FMLA certification at the time of her termination. Defendant contends that it did not deny Plaintiff any requested FMLA leave, and Plaintiff disputes this. She says that, instead of allowing her to take FMLA leave, she was terminated. See Plaintiff's Supplemental Memorandum in Opposition to Motion for Summary Judgment, Dkt. # 45. Therefore, the Court denies the motion for summary judgment as to this claim.

**II. FMLA Retaliation Claim**

An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. . . Employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions." 29 C.F.R. § 825.220(c). The Fourth Circuit has set forth the analytical framework for FMLA retaliation cases in which the employee has no direct evidence of discrimination.

---

[14] Plaintiff argues in her brief as follows: "Plaintiff has alleged an FMLA denial-of-leave claim, and an FMLA retaliation claim. Complaint Paragraphs 59-60, 64-65. ADA claims in which the accommodation is 'leave' have substantial overlap with FMLA claims. The preceding ADA arguments therefore apply with equal force to the FMLA claims and are incorporated herein." (Dkt. #34, p. 31).

> FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973). See Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001). Thus, to succeed on his retaliation claim, (a plaintiff) must first make a prima facie showing 'that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity.' Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998). If he 'puts forth sufficient evidence to establish a prima facie case of retaliation' and (the employer) 'offers a non-discriminatory explanation' for his termination, (the employee) 'bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation.' Nichols, 251 F.3d at 502.

Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 550-551 (4th Cir. 2006).

As to the FMLA retaliation claim, the evidence taken in a light favorable to Anderson shows that she has satisfied her prima facie case by showing that she engaged in a protected activity (taking FMLA leave) and experienced an adverse employment action, her termination. There is also evidence of a causal connection between the taking of leave and the termination as shown by the temporal proximity between her exercise of her FMLA leave in last June of 2009 and seeking to take additional leave in July of 2009 and her termination on July 24, 2009. However, Plaintiff has not shown in the record sufficient evidence of pretext, and to the extent she argues the same bases for pretext as in the ADA disparate treatment claim, the FMLA retaliation claim fails for the reasons mentioned earlier in this order.

## Conclusion

For the foregoing reasons, the undersigned adopts the Report and Recommendation of the Magistrate Judge in part and respectfully declines to adopt it in part. The defendant's [32] Motion for Summary Judgment is granted as to the ADA disparate treatment and retaliation claims and as to the FMLA retaliation claim. The motion is denied as to the failure to accommodate claim under the ADA and as to the FMLA entitlement claim.

The parties are instructed to mediate this case within two (2) weeks from the date of this order.

The case will be set for trial during the Court's March 1, 2012 term.

**AND IT IS SO ORDERED.**

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

February 3, 2012
Florence, South Carolina